UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MENDY BARNETT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:17-CV-155-HSM-CCS |
| | ) | |
| BONNIE HOMMRICH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court are two Motions to Disqualify Counsel [Docs. 5, 28]. The former Motion was filed by Defendants Bonnie Hommrich, Douglas Dimond, Sophia Crawford, and Daniel Smithwick, and the latter Motion was filed by Tennessee Department of Children's Services ("DCS") and Bonnie Hommrich, in her official capacity.

By way of background, the Court addressed the former Motion at a hearing on August 29, 2017, and the hearing was continued to September 6, 2017. At the conclusion of the September 6 hearing, it was brought to the Court's attention that DCS had not been served. Plaintiffs agreed to promptly serve DCS, and the parties agreed to file a stipulation that DCS and Bonnie Hommrich, in her official capacity, would join the already filed Motion to Disqualify [Doc. 5]. *See* [Doc. 27].[1] After Plaintiffs effected service, DCS and Hommrich, in her official capacity, filed their Motion to Disqualify Counsel [Doc. 28], which incorporated the previously filed Motion.

---

[1] Service was made on the assistant attorney general, who represented the individual Defendants at the hearing.

Subsequently, Plaintiffs filed a Notice of Voluntary Dismissal of DCS and Bonnie Hommrich, in her official capacity. [Doc. 29]. Given that DCS and Hommich were dismissed, the Court allowed the parties to file additional briefs regarding the disqualification issue. [Docs. 32, 37]. The Motions are now ripe for adjudication. Accordingly, for the reasons further explained below, the Court **DENIES** the Motions to Disqualify [**Docs. 5, 28**].

## I. BACKGROUND

The Complaint [Doc. 1] in this matter was filed on April 21, 2017.[2] The Complaint alleges that on April 21, 2016, DCS wrongfully removed the children from their parents' legal and physical custody and placed them in foster care, where they remained until May 25, 2016. [*Id.* at ¶ 9]. The Complaint continues that the children were returned to the parents' physical custody on May 25, 2016, by virtue of a "trial home placement," in which the State retained legal custody of the children until June 15, 2016, at which time the State voluntary dismissed its case against the parents. [*Id.*]. The Complaint states that the absence of promulgated rules and policy that fail to meet constitutional standards led to the injury to the Plaintiffs and is part of an ongoing pattern and practice, injuring thousands of children and families each year with many more children having sustained damages in the past after being wrongfully removed by DCS, despite a clear statement of the law contrary to the policies and procedures implemented by DCS. [*Id.* at ¶ 10].

With respect to the alleged wrongful removal in this case, the Complaint states that DCS received a referral on or about March 18, 2016, alleging that the children were dirty and hungry while left with caregivers. [*Id.* at ¶ 11]. On March 21, 2016, an unknown agent of DCS made contact with Plaintiff Barnett at the family home, and Plaintiff Barnett refused entry into the home

---

[2] The Complaint was filed by Mendy Barnett, Marc Winters, Vivian Winters, and James Walker. Mendy Barnett and Marc Winters are the parents. Although the Complaint does not explain the identity of Vivian Winters and James Walker, the Court believe that these two Plaintiffs are the grandparents.

and directed the individual to leave the property. [*Id.* at ¶ 12]. On March 31, 2016, Defendant Smithwick, or those acting under his direction, filed an Application and Order to Investigate with the Jefferson Juvenile Court. [*Id.* at ¶ 13]. On the same date, the Juvenile Court of Jefferson Country entered an order permitting DCS to have access to the child and the child's home for purposes of the investigation. [*Id.* at ¶ 14]. The order also permitted DCS to take physical possession of the children for the purpose of obtaining a medical or forensic exam. [*Id.*]. The Complaint continues that the order was obtained ex parte, it was never served, there was no summons issued, nor was a hearing held or scheduled. [*Id.* at ¶ 15].

The Complaint states that on April 21, 2016, the child ("MGW") was located at the paternal grandparents' house, wherein the child was removed with the assistance of law enforcement. [*Id.* at ¶¶ 16-17]. Defendant Cervino contacted the parents and asked that they return to the grandparents' residence with their other child ("MW"), and the parents refused. [*Id.* at ¶¶ 23-24]. MGW was transported to Children's Hospital, and medical professionals determined that no medical treatment was necessary. [*Id.* at ¶ 26]. The grandparents requested that MGW be returned, but Defendants Cervino and Smithwick declined, and Defendant Cervino contacted the parents, stating that she would only release MGW if they appeared with MW at the hospital. [*Id.* at ¶¶ 27-29]. The Complaint alleges that the parents directed Defendant Cervino to release MGW to the grandmother, but she declined. [*Id.* at ¶¶ 30-31].

The Complaint continues that at approximately 11:05 p.m., Defendant Smithwick made a determination that MGW and MW were to be brought into legal and physical custody of the State of Tennessee. [*Id.* at ¶ 31]. The Complaint states that at no point during the investigation did any agent of DCS see, examine, or otherwise come in contact with MW. [*Id.* at 32]. MGW was placed in a foster home on April 22, 2016. [*Id.* at ¶ 33]. The Complaint states that MW remained in

Plaintiffs' physical possession until April 25, 2016, at which time a Petition for Legal Custody and Ex Parte Order was entered with the Juvenile Court of Jefferson County. [*Id.* at ¶ 34]. The petition alleged, in part, that the grandparents were unable to maintain the safety of the child due to their ages and disabilities and that the parents had abandoned the child. [*Id.* at ¶¶ 35-36]. The Complaint states that Plaintiffs were denied access to their children in excess of four weeks. [*Id.* at ¶ 37]. The Complaint alleges that during such time, the children were subjected to medical treatment without Plaintiffs' consent. [*Id.* at ¶ 38].

The Complaint states that a preliminary hearing was timely set at the Juvenile Court on April 27, 2016, at which time the parents waived their right to the same. [*Id.* at 39]. On or about May 23, 2016, Plaintiff Mendy Barnett revoked her waiver of a preliminary hearing, and the Juvenile Court timely scheduled a hearing on May 25, 2016. [*Id.* at ¶ 40]. On the same date, Defendants returned the children to the parents' custody on a trial home visit pursuant to Tennessee Code Annotated § 37-1-129, with the state retaining legal custody without the necessity of a hearing. [*Id.* at ¶ 41]. Later, on June 15, 2016, the parties appeared for a scheduled hearing, at which time, DCS gave notice of a voluntary dismissal of the action. [*Id.* at ¶ 42].

The Complaint requests that DCS be prohibited from removing children from their parents/caregivers without a valid court order. [*Id.* at 48].[3] The Complaint further alleges violations of the Fourth and Fourteenth Amendments; deprivations of the right and freedom of association; violations of the Americans with Disability Act; violations of the equal protection of laws; deprivations of the fundamental liberty interest in the determination of medical care, examination, and treatment of the children; deprivations of the fundamental liberty interest of families to have the society of one another; and negligent supervision. [*Id.* at 8-18]. In addition,

---

[3] As mentioned above, DCS was later voluntary dismissed.

the Complaint alleges that Defendant Hommrich failed to ensure that properly promulgated rules were in effect to govern the removal of children into state's custody and that Defendant Dimond failed to educate subordinate attorneys to act in accordance with the law and that he knowingly, willfully, and wantonly allowed unlawful practices by subordinate attorneys that deprived Plaintiffs of due process of law. [*Id.* at 17-22].

## II.     EVIDENCE

Prior to the presentation of the evidence, Attorney Trujillo stated, at the August 29 hearing, that the parties had agreed to several facts. Specifically, DCS has filed six cases against Plaintiff Barnett from 2010 to 2016. [Doc. 35 at 5]. Attorney Trujillo was involved in a 2010 case, wherein she represented Plaintiff Barnett against DCS. [*Id.*]. Attorney Trujillo began her employment with DCS in January 2011 and was promoted to Regional General Counsel ("RGC") in 2012. [*Id.* at 6-7]. In 2015, she represented DCS against Plaintiff Barnett. [*Id.*].

In addition, Attorney Trujillo announced the following facts to the Court, which do not appear to be in dispute. Attorney Trujillo stated that she left on medical leave in December 2015 and that Defendant Smithwick took over her supervisory duties. [*Id.* at 7]. She was Smithwick's supervisor, but when she was on medical leave, Sophia Crawford was his supervisor. [*Id.*]. She stated that she was still being paid during that time and that there was a short period of time when she was permitted to work five hours a day. [*Id.* at 7-8]. She was hospitalized on March 30, 2016, and returned to the office on April 25, 2016. [*Id.* at 7-8]. She provided her two-week notice on April 25, 2016, and her resignation was effective May 9, 2016. [*Id.* at 8]. She stated that when she came back to the office on April 25, her job title was RGC, but Defendant Smithwick was actually managing the region. [*Id.* at 8]. Attorney Trujillo stated that Defendant Smithwick

decided to remove Plaintiffs' children and that his direct supervisor at that time was Sophia Crawford (although ordinarily, it would have been Attorney Trujillo). [*Id.* at 9-10].

During the hearings, Defendants called Susan Kovac as a witness, and Plaintiffs called Defendant Smithwick a witness. The Court will briefly summarize their testimony below.

### 1. Susan Kovac

Susan Kovac is currently the RGC for DCS in Knox County. [Doc. 35 at 16]. She supervises and trains all the subordinate attorneys, as do all RGCs. [*Id.* at 17]. Kovac was in regular contact with Attorney Trujillo, and they discussed responsibilities. [*Id.* at 18].

Kovac stated that she was familiar with the policy change within DCS. [*Id.* at 19]. Kovac testified that there were two Sixth Circuit cases that were of particular concern to DCS's lawyers, as well as the Attorney General. [*Id.*]. She continued that the Attorney General suggested that the agency would no longer be defended if the agency removed any child without first obtaining an order. [*Id.*]. Kovac stated that the agency disagreed with that interpretation of the law, but it did not have a policy that was clearly enforceable and that distinguished "exigent" circumstances removals, which the agency believed it was allowed to do even under the Sixth Circuit cases. [*Id.*]. Kovac stated, "From what our client tended to think of as emergencies, that applied to almost every removal they saw." [*Id.*].

Kovac testified that the department faced a significant, immediate crisis because the Attorney General stated that it would not defend the department, but such action (or nonaction) could leave children in danger. [*Id.*]. Kovac stated that everyone was discussing the crisis, and it was a major topic at the annual CLE retreat. [*Id.* at 20]. During the annual CLE, there was a small group that participated in very intense discussions regarding how the policy needed to be rewritten, and the meeting was the beginning of rewriting the policy. [*Id.*]. Attorney Trujillo

participated in those discussions, and they discussed the new Sixth Circuit cases and the Fourth Amendment's requirements for legally removing children. [*Id.*]. They also discussed how the policy in effect at that point did, or did not, fit with the status of the law and what the new policy should look like in general terms. [*Id.* at 21]. While they did not discuss specific terms of the new policy, they discussed the direction that they needed to take in order to craft a policy that the Attorney General would defend. [*Id.*]. They debated and developed what the policy should generally look like. [*Id.*]. Kovac continued that they left the meeting with instructions about further work that needed to be finished to pull a policy together. [*Id.*]. Afterwards, Kovac pulled the policy together, circulated it to the RGCs, and then presented it to the Attorney General before it was ultimately put into the right wording and accepted as policy. [*Id.* at 22]. She stated that Attorney Trujillo was part of the process. [*Id.*].

On cross examination, Kovac testified that the meeting that occurred during the CLE retreat was not a set or planned meeting. [*Id.* at 23]. She described the meeting as a "crisis caucus" and not a scheduled policy meeting. [*Id.* at 24]. She stated that the change in the law must inform DCS policy and that the law always trumps. [*Id.*]. She continued that they were told that the policy was indefensible and that the practice could not continue, so the lawyers, which included RGCs, needed to step in and make sure that the policy was in compliance with the law. [*Id.*]. Kovac stated that Attorney Trujillo attended the discussion group for a couple of hours and that she was "there enough to be helpful." [*Id.* at 25]. Kovac testified that she believed that Attorney Trujillo was an integral part of the analysis, in terms of thinking through the issues and how they would be applied to the child welfare practice, what "exigent" meant, and how it could be defined for program staff. [*Id.*].

Kovac continued that after the discussion group, attorneys in the general counsel's office researched equivalent policies, and Kovac drafted the policy based on the research. [*Id.* at 26]. She then circulated it among people in the general counsel's office. [*Id.*]. Kovac stated that Attorney Trujillo was not particularly asked to review the policy or to draft the policy. [*Id.*]. Kovac stated that the draft was sent to the RGCs, but she does not recall Attorney Trujillo formally participating. [*Id.* at 27]. Kovac stated that after that weekend of the CLE conference, she does not recall Attorney Trujillo being part of the policy-making process. [*Id.*].

Upon questioning from the Court, Kovac testified that she does not recall the policy being circulated for approval to the other RGCs. [*Id.* at 28]. She further stated that she does not recall soliciting questions or comments from the other RGCs. [*Id.*]. She testified that she sent the policy to the RGCs because everyone needed to know where they were heading. [*Id.* at 28-29]. Kovac testified that it was not the policy at first because it needed to be presented to the Attorney General and that she had to get her own program people to review what was legally correct, and they did some rewriting. [*Id.* at 29]. Kovac continued that DCS's lawyers are certainly supposed to be familiar with whatever policy relates to DCS's work. [*Id.* at 31]. She continued that RGCs enforce the policies to the "extent legal is involved." [*Id.* at 31-32]. She explained that she supervises the lawyers but not the investigators. [*Id.* at 32-33]. She stated that if she discovers a case manager not following policy that impacts her legal work, she reports such to the case manager's supervisor. [*Id.* at 33]. She stated that investigators, prior to the policy change, believed everything was an emergency situation and that once the policy changed, the situation had to be exigent. [*Id.* at 35]. Exigent removals cannot happen without the RGC agreeing to such removals so that DCS can legally meet the terms of "exigent circumstances." [*Id.* at 33]. Kovac testified that the policy took effect in late 2013 and that she and Attorney Trujillo had discussions regarding the policy

change after it went into effect. [*Id.* at 34]. Attorney Trujillo did not raise concerns that the policy was unconstitutional, but they had conversations as to whether people were following the policy, whether the case managers were doing what they were supposed to do, whether it was being enacted properly, whether people understood it, and whether they were paying attention when they explained what the law required. [*Id.*]. Kovac testified, and Attorney Trujillo agreed, that it was important to both of them that that policy be followed by investigators and case managers. [*Id.* at 35].

## 2. Daniel Smithwick

Plaintiffs called Daniel Smithwick to testify in this case. [Doc. 36 at 10]. Smithwick is employed with DSC as RGC for the Smoky Region. [*Id.* at 11]. Smithwick stated that he filed an affidavit with the Court. [*Id.*]. He testified that his personal recollection was that Attorney Trujillo went on intermittent medical leave in January 2016. [*Id.* at 12]. He explained that at times, she worked from 8:00 a.m., to 3:00 p.m., and that sometimes, she was full time, and other times she was out. [*Id.*]. He testified that he was put in a long-term position as RGC on May 20, 2016. [*Id.* at 13]. He testified that DCS attorneys frequently worked from home. [*Id.* at 14]. He stated that during January to April 2016, Attorney Trujillo was his supervisor. [*Id.* at 15]. Smithwick testified that Attorney Trujillo was responsible for approving all after-hour removals from 2012 to 2015. [*Id.* at 18]. Smithwick testified that Attorney Trujillo stated, "I'm going to approve all the after-hours removals. I'm the only one that does that." [*Id.* at 18-19].

Smith testified that Attorney Trujillo's responsibilities as RGC were to attend meetings every other month, disseminate information learned from the meetings, hold periodic meetings with attorneys, and provide subordinate attorneys with directions regarding policy and case law. [*Id.* at 21]. Smithwick continued that Attorney Trujillo also participated in meetings, where she

and others discussed current case law, changes in policy, and current trends in the law. [*Id.* at 22].

He explained that it was an opportunity for RGCs to get together and discuss legal strategy. [*Id.* at 23].

Smithwick stated that the annual CLE was not confidential but that the CLE was attended by government attorneys and the same information would not have been presented at the Tennessee Law Institute. [*Id.* at 25]. He continued that there were probably several attorneys who were not directly employed by the State of Tennessee and that the presenter was not affiliated or employed with the agency. [*Id.* at 25-26]. Smithwick testified that he believed Attorney Trujillo's representation is problematic because she trained him and other DCS attorneys and that she has raised issues of training and supervision in the Complaint. [*Id.* at 26].

Smithwick continued that Attorney Trujillo supervised the attorneys who were responsible for the children's removal. [*Id.* at 27]. He continued that Attorney Trujillo participated in a 2015 adjudicatory hearing involving Plaintiff Barnett. [*Id.*]. He stated that in the 2016 action, he emailed Attorney Trujillo the case report from the 2015 hearing and stated, "Agnes, I think you have a conflict with this case." [*Id.*]. He explained that he does not know whether Attorney Trujillo communicated with the case managers who did the 2015 removal of the children but that she participated in Plaintiff Barnett's adjudicatory hearing. [*Id.* at 29]. He acknowledged that he does not have personal knowledge of whether Attorney Trujillo oversaw the 2015 removal. [*Id.* at 31].[4]

Smithwick testified that when a DCS attorney had a prior client who had continuing DCS litigation, DCS states, "That attorney shall never touch this file." [*Id.* at 36-37]. He agreed that

---

[4] The parties agreed during the hearing that Attorney Trujillo supervised the attorneys who removed the children in 2015 but that she did not oversee the removal of the children in 2015. [Doc. 36 at 32-33].

Plaintiff Barnett was one of the clients that Attorney Trujillo identified as having a conflict. [*Id.* at 42-43]. Smithwick testified that if he was handling a conflict case for Attorney Trujillo, he would not have discussed the matter with Attorney Trujillo, despite her being his supervisor. [*Id.* at 46].

With respect to the June 2015 adjudicatory hearing involving Plaintiff Barnett, Smithwick testified that he does not recall if he appeared at a preliminary hearing or even if he drafted the petition. [*Id.* at 50]. He stated that even if a parent waives his/her right to an adjudicatory hearing, the DCS attorney still has to prepare for the hearing. [*Id.* at 51]. He continued, "However, to say that it doesn't require preparation or it does require preparation would require you to know what the parent is going to do before you go into the hearing. Sometimes they waive and sometimes they don't. I think the level of preparation would be the same. I mean, you have agreed to prepare for all hearings." [*Id.*]. He testified that when Attorney Trujillo entered a notice of appearance for the 2016 case, he found a 2015 case recording and told her that he believed she had a conflict. [*Id.* at 52]. He identified Exhibit 1 and stated that it was the case recording that he provided to Attorney Trujillo. [*Id.* at 54]. He agreed that the conflict was announced to the juvenile court and that the court indicated that it was not an issue since Plaintiff Barnett waived the hearing. [*Id.* at 55]. Smithwick further explained that an adjudicatory hearing was a "very significant event," where the court is called upon to determine whether the allegations in the petition are proven by clear and convincing evidence. [*Id.* at 59]. If a parent waives his/her hearing, that means the parent does not want to contest. [*Id.*].

Smithwick agreed that Attorney Trujillo did not have any personal involvement in the 2016 litigation that underlies the instant case, until she later represented Plaintiff Barnett. [*Id.* at 61]. He stated that even if Attorney Trujillo was in the office and not on medical leave, he would not

have consulted with her about the case because of the conflict. [*Id.*]. He stated that in March 2016, a new petition was filed. [*Id.* at 61-62]. He stated that a new petition was filed in March 2016 based on the allegations that occurred in March 2016; however the petition also referenced Mendy Barnett's prior history with DCS. [*Id.* at 62]. He acknowledged, however, that he brought the cause of action because of new "things" that happened in Spring 2016. [*Id.*].

Smithwick testified that as RGC, he does not make policy, but he participates in groups that make recommendations about policy. [*Id.* at 64-65]. He stated that it is not the responsibility of a DCS field supervisor or field attorney to develop policy, but they may participate in groups that recommend policies to the commissioner. [*Id.*].

On cross examination, Smithwick testified that prior to becoming RGC for the Smoky Region, Attorney Trujillo was his direct supervisor and that she was responsible for supervising him on a daily basis. [*Id.* at 66-67]. He stated that she was responsible for supervising whether he followed the department's policy with respect to the Fourth Amendment and the department's policy regarding the removal of children from homes. [*Id.*]. Smithwick testified that he consulted with Attorney Trujillo prior to approving removals of children. [*Id.*]. He explained, "That came up from time to time. If you get one where the client wants to do a removal and I disagree with that then I might say to the client, I'm not giving you permission but you can go over my head, and you can speak to my supervisor and then the supervisor and I would talk about that." [*Id.* at 67]. He and Attorney Trujillo would then discuss whether the removal was appropriate. [*Id.*]. He stated that he did not keep track of federal cases and that he received such information from Attorney Trujillo. [*Id.* at 67-68]. Smithwick testified that Attorney Trujillo had the same supervisory responsibilities with respect to other DCS attorneys in her region and that Attorney

Trujillo was responsible for training him regarding the Fourth Amendment and removals. [*Id.* at 68]. She was also responsible for training other attorneys in the DCS region. [*Id.*].

Smithwick testified that he knows Attorney Trujillo approved removals because after a removal into DCS custody, the case manager sends documentation, which includes the facts, addresses, names, dates of birth, and "time of removal approved by." [*Id.* at 69]. He continued that Attorney Trujillo was responsible for after-hour removals, which included weekends. [*Id.* at 70].

Smithwick testified that there is an electronic database called "TFACTS," which stores legal pleadings. [*Id.* at 74]. With respect to physical files, he stated that there is a foster care file, a Child Protective Services ("CPS") file, and a legal file. [*Id.* at 75]. There are no efforts to keep these files out of the hands of attorneys who are conflicted from the cases. [*Id.* at 76]. He stated that a normal CPS case cannot be closed to a particular DCS attorney. [*Id.* at 76-77]. He stated that a conflicted attorney could access the electronic files for a particular case. [*Id.* at 77-78]. He has no information that Attorney Trujillo accessed files for cases that she had a conflict. [*Id.* at 77].

On redirect examination, Smithwick testified that he had a unique identifier to log into TFACTS. [*Id.* at 78]. He stated that there seems to be a warning that access is monitored, but he does not remember. [*Id.*]. He stated that he assumed that a "big database" would be able to determine, "You were looking at this file and this file and this file." [*Id.* at 79]. He testified that the Council of Accreditation requires that files be locked up and kept in a certain condition. [*Id.*]. He stated that foster care and CPS case files are supposed to be kept in locked drawers. [*Id.* at 79-80]. DCS was accredited by the Council of Accreditation in 2015 and 2016. [*Id.* at 80].

## III.    POSITIONS OF THE PARTIES

The instant matter does not involve the underlying merits of this case.  Instead, the individual Defendants and DCS, who is no longer a party, have moved to disqualify Plaintiffs' counsel, Attorney Trujillo from this case.  The parties' positions are summarized as follows.

Defendants submit [Doc. 6] that Attorney Trujillo should be disqualified as counsel for Plaintiffs in the present matter because she was personally and substantially involved in substantially similar prior matters between these parties as counsel for DCS.  Defendants continue that Attorney Trujillo was employed by DCS as RGC to provide legal services and representation and that a past-attorney client relationship existed between her and DCS.  In addition, as RGC for DCS, Attorney Trujillo worked with confidential department information, including information relating to DCS's interactions with Plaintiffs.  Defendants submit that the first and third prongs articulated in *Dana Corp. v Blue Cross & Blue Shield Mutual of N. Ohio*, 900 F.2d 882 (6th Cir. 1990) have been met (*i.e.*, past-attorney client relationship existing between the party seeking disqualification and the attorney acquired confidential information from the party seeking disqualification).

Further, Defendants assert that Attorney Trujillo's past relationship with DCS is substantially related to the current dispute between DCS and Plaintiffs.   Defendants state, prior to Attorney Trujillo's employment as RGC, she advised Plaintiffs in a DCS investigation in 2010.  After joining DCS, she oversaw an investigation into Plaintiffs beginning in April 2015 and that she personally approved a child's removal due to Plaintiffs' drug use, environmental issues, difficulty in locating Plaintiffs and fear that they might attempt to flee with the children, and marks of potential abuse observed on a child.  In addition, Defendants assert that Attorney Trujillo also represented DCS in the resulting adjudicatory hearing on June 17, 2015.  Defendants state that

Attorney Trujillo was personally and substantially involved in a case between DCS and Plaintiffs where DCS, at Attorney Trujillo's discretion, removed the children for the same basic reasons that they were removed in the 2016 case. Further, Defendants state that Attorney Trujillo's client in the present matter seeks to bring this action against Attorney Trujillo's former supervisor, her former direct subordinate, and other members of DCS's legal leadership with whom she worked on a regular and comprehensive basis. Defendants add that Plaintiffs' claims arise out of events that took place while Attorney Trujillo was stilled employed by DCS.

Defendants further argue that Attorney Trujillo should be disqualified as counsel because she is a necessary witness to contested issues and because disqualification would not work a substantial hardship to her clients. Defendants assert that Tennessee Rule of Professional Responsibility 3.7 bars Attorney Trujillo's representation in this matter. In support of their Motion, Defendants filed an Affidavit by Daniel Smithwick [Doc. 6-1] and a June 2015 order from the Jefferson County Juvenile Court [Doc. 6-2].

Plaintiffs respond [Doc. 12] that Attorney Trujillo has not been in a significant supervisory position since 2015 and that Sophia Crawford assigned that task to Defendant Smithwick, despite Attorney Trujillo's recommendation to the contrary. Plaintiffs state that Attorney Trujillo did not gain any relevant, confidential government information during her time in public office. Further, Plaintiffs argue that Barnett's case was considered a conflict when Attorney Trujillo began her employment with DCS as a result of Attorney Trujillo's prior representation of Barnett and, as a result, Barnett's case was handled by another attorney. Plaintiffs assert that the 2015 and 2016 Barnett matters are not substantially related. In addition, Plaintiffs assert that Defendants waived objection to Attorney Trujillo's representation in the instant lawsuit because Attorney Trujillo represented Barnett on DCS's 2016 petition after her separation from employment with DCS, and

Defendants did not object. Plaintiffs explain that approximately three weeks after leaving the agency, Attorney Trujillo entered a notice of appearance on behalf of Barnett, and Defendant Smithwick voluntary dismissed the action at the final hearing.

Plaintiffs also assert that Defendants may not use disqualification as a tactic or strategy and that Barnett would be unduly prejudiced by being required to seek new counsel. Finally, Plaintiffs submit that a determination as to Attorney Trujillo being a necessary witness is premature, and it does not disqualify counsel from participating in pretrial matters.

Defendants filed a Reply [Doc. 14], asserting that Attorney Trujillo has special knowledge that creates a conflict of interest and that DCS has not waived Attorney Trujillo's conflict. Further, Defendants assert that DCS is not using disqualification as a tactic or strategy and that disqualification does not unduly prejudice Plaintiffs.

As mentioned above, following the September 6 hearing, Plaintiffs agreed to serve DCS and Bonnie Hommich, in her official capacity, and that once served, these Defendants would join the Motion to Disqualify. Plaintiffs served DCS and Defendant Hommich, in her official capacity, and later these Defendants filed a Motion [Doc. 28], incorporating the previously filed Motion to Disqualify [Doc. 5]. Approximately, two weeks later, Plaintiffs filed a Notice of Voluntary Dismissal [Doc. 29] for all claims against Defendants DCS and Hommrich, in her official capacity. The Notice states that Plaintiffs concede that the Eleventh Amendment of the United States Constitution barred Plaintiffs' claims against them.

Due to the voluntary dismissal of DCS and Hommrich, in her official capacity, the Court allowed supplemental briefing [Docs. 32, 37], which was filed on September 26, 2017, and October 10, 2017, respectively. Plaintiffs' Supplemental Brief [Docs. 32] asserts that there is no attorney-client relationship. Plaintiffs explain that although the individual Defendants in this

matter are represented by the same attorney as DCS, it is undisputed that DCS is the only entity in which Attorney Trujillo had a past-attorney client relationship. Plaintiffs continue that they have voluntarily dismissed DCS and that the individual Defendants seeking disqualification of Attorney Trujillo do not have an attorney-client relationship with her.

Defendants' Supplemental Brief [Doc. 37] asserts that DCS's presence in the litigation is not required for disqualification. Defendants argue that the former client does not need to be a party to the second litigation in order for an attorney to be disqualified. Defendants further submit that Tennessee Rule of Professional Conduct 1.9 does not mention that the former client must be a named party in litigation. Defendants argue that, instead, Rule 1.9 only requires that the interests of the new client be materially adverse to the former client. Defendants state that Rule 1.11, which applies to former government attorneys, contains additional restrictions but does not supplant Rule 1.9.

Defendants further assert that even though DCS is not a party to the litigation, Attorney Trujillo's representation is materially adverse to the State of Tennessee. Because DCS is an agency of the State, Attorney Trujillo's employment as an attorney for the DCS is properly viewed as an attorney-client relationship with the State. Defendants assert that the State is the true party in interest because the State will ultimately be responsible for any monetary damages awarded against the individuals Defendants. Defendants explain that Tennessee Code Annotated § 9-8-12 obligates the State, through the Claims Commission, to reimburse any judgment against State employees acting in their scope of employment. Further, Defendants assert that the evidence at the hearings demonstrate that Attorney Trujillo is likely to be a necessary witness in this litigation. Defendants explain that as RGC, Attorney Trujillo was Defendant Smithwick's direct supervisor and Defendant Crawford's direct report. Attorney Trujillo also reported to Defendant Dimond

through Defendant Crawford.  The Complaint alleges that Defendant Dimond failed to supervise Defendant Smithwick—at task that Attorney Trujillo was at least arguably responsible.  Further, Defendants state that part of the qualified immunity analysis turns on whether a reasonable official in Smithwick's position would have done as he did and as the attorney who was most similarly situated, Attorney Trujillo is a necessary witness as it relates to qualified immunity.

## IV.    ANALYSIS

As an initial matter, several courts have noted that motions to disqualify counsel are sensitive, and they "require the Court to exercise judgment with an eye toward upholding the highest ethical standards of the professional, protecting the interest of the litigants in being represented by the attorney of their choosing, protecting the loyalty and confidences a prior client may have placed in a law firm or an attorney, and the overriding societal interests of the integrity of the judicial process." *Cavender v. U.S. Xpress Enterprises, Inc.*, 191 F. Supp. 2d 962, 964 (E.D. Tenn. 2002) (citing *Bartech Industries v. International Baking Co.*, 910 F. Supp. 388, 392 (E.D. Tenn. 1996)) (other citations are omitted).  To prevail on a motion to disqualify, the movant bears "the burden of proving that opposing counsel should be disqualified." *McKinney v. McMeans*, 147 F. Supp.2d 898, 900 (W.D. Tenn. 2001) (citing *Bartech Indus.*, 910 F. Supp. at 392).

The Court's authority to disqualify attorneys based upon a professional conflict is derived from two sources. First, pursuant to the Court's Local Rules, attorneys who appear in this Court are governed by the Tennessee Rules of Professional Conduct.  E.D. L.R. 83.6.  "Second, since motions to disqualify counsel affect substantive rights of the parties, such motions are decided by applying standards developed under federal law." *Cavender*, 191 F. Supp.2d at 965-66 (citing *Bartech Industries*, 910 F. Supp. at 392).  The Sixth Circuit has adopted a three-part test for disqualification: "(1) a past attorney-client relationship existed between the party seeking

disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification." *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990)).

With the above analysis in mind, the Court will turn to the issues raised in the present matter. During the hearing, Defendants asserted that there were two primary issues: (1) whether Attorney Trujillo was personally and substantially involved with the Barnett family in her representation of DCS, and (2) whether Attorney Trujillo was personally and substantially involved with DCS's revising of its Fourth Amendment policy. *See* [Doc. 36 at 5]. Further, Defendants' Motion argues that Attorney Trujillo is likely to be a necessary witness. The Court will address these arguments separately.

Tennessee Rules of Professional Conduct 1.11(a) provides as follows:

> Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government:
>
> (1)  is subject to RPC 1.9(c); and
>
> (2)  shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.

The first question before the Court is whether Attorney Trujillo's participation in the 2015 adjudicatory hearing disqualifies her representation in the instant matter. Comment 10 to Rule 1.11 explains that a " 'matter' may continue in another form. In determining whether two particular matters are the same, the lawyer should consider the extent to which the matters involve the same basic facts, the same or related parties, and the time elapsed."

In the present matter, Attorney Trujillo represented Mendy Barnett in a 2010 action that DCS commenced. In 2011, Attorney Trujillo began working for DCS and was promoted to RGC in 2012. She identified Mendy Barnett as someone whom she had a conflict. In June 2015, Attorney Trujillo attended an adjudicatory hearing on behalf of DCS against Mendy Barnett, where her conflict was announced to the court but waived. Smithwick testified that he did not have any personal knowledge of whether Attorney Trujillo oversaw the actual removal in 2015 but that she did participate in the 2015 adjudicatory hearing. The Case Recording Summary [Ex. 1] from the hearing states that the case manager staffed the case with Attorney Trujillo and the case manager "reiterated concerns over the parents' compliance, accusations, etc." [Ex. 1]. Attorney Trujillo and others also discussed placement for the child and were able to agree on a resolution. The Case Recording Summary further provides, "The team originally came together for the adjudicatory hearing, when attorney conflicts of interests were identified and a waiver was required. The conflicts were discussed and all were waived." [Ex. 1]. In addition, Attorney Trujillo announced the agreement that was reached by the parties to the court, and the parents waived the adjudicatory hearing. [Ex. 1]; *see also* [Doc. 6-2] (the court order that was entered).

Attorney Trujillo took intermittent medical leave beginning in December 2015 or January 2016. In March 2016, DCS received a referral regarding potential environmental neglect in Barnett's home. In March 2016, DCS filed a petition against Barnett and Winters based on allegations that occurred in March 2016. Smithwick testified that the petition referenced Barnett's prior history with DCS, but he acknowledged that he brought the cause of action because of new "things" that happened in Spring 2016.

Attorney Trujillo returned to the office on April 25, 2016, and provided her two-week notice on the same. Her resignation was effective May 9, 2016. Subsequently, she entered a notice

of appearance on behalf of Barnett with respect to the petition that Smithwick filed in March 2016. The 2016 petition against Barnett and Winter was later dismissed.[5]

The Court has considered the parties' filings and the evidence presented at both hearings in this case. The Court finds that Attorney Trujillo did not participate "personally and substantially" in the Barnett and Winter's matters, thus not barring her representation here. Based on the evidence before the Court, it appears that Attorney Trujillo only attended the 2015 adjudicatory hearing, and the parties admitted that she did not oversee the actual removal.[6] While she personally appeared at the 2015 adjudicatory hearing, she did not substantially participate in the 2015 matter, given that her name is not on any of the pleadings in that case, *see* [Ex. 3], and there is no evidence before the Court that she participated in any other matter with respect to Barnett or Winters.

Further, even if she did "personally and substantially" participate in the 2015 matter, the March 2016 petition was filed when she was on medical leave, and Smithwick testified that the 2016 petition was filed over different allegations than the previous allegations against Barnett and Winters. The instant lawsuit arose from the March 2016 petition, which Attorney Trujillo was not personally or substantially involved in. While Defendants argue that Attorney Trujillo was supervising Smithwick at the time, the Court finds two issues with this position. First, Attorney Trujillo was on medical leave at the time the March 2016 petition was filed, and as mentioned above, there is no evidence before the Court that she was involved, either substantially or personally, in the filing of the March 2016 petition. Second, the Court does not read Rule 1.11 so narrowly. The Court finds that such a narrow interpretation of Rule 1.11 would prevent Attorney

---

[5] In support of Defendants' Motion to Dismiss, the Court observes that there were several documents filed relating to the 2016 matter. *See* [Docs. 4-1, 4-2, 4-2].

[6] *See infra* footnote 4.

Trujillo from accepting any new clients whom DCS litigated against during Attorney Trujillo's tenure on the basis of her position as RGC, despite her lack of substantial or personal participation in a matter. Such a position is contrary to Comment 4, which provides as follows:

> On the other hand, the rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government. The government has a legitimate need to attract qualified lawyers as well as to maintain high ethical standards. Thus, a former government lawyer is disqualified only from particular matters in which the lawyer participated personally and substantially.

Accordingly, the Court finds Defendants' arguments not well taken on this point.

Defendants assert that Attorney Trujillo was personally and substantially involved in the DCS's Fourth Amendment policy. Specifically, Defendants argue that Attorney Trujillo was personally and substantially involved in developing DCS policies and training regarding controversies and claims, such as the bases of Plaintiffs' current claims against DCS. Defendants assert that Attorney Trujillo has access to special knowledge regarding DCS's internal legal interpretations, policies, procedures, and standards and that she is attempting to use such against DCS. Defendants continue that Plaintiffs are suing DCS and its employees based on a failure to train and failure to supervise and that Attorney Trujillo has specific knowledge of the steps that DCS took to train and supervise its employees, as well at specific knowledge regarding DCS attorneys' interpretation of their duties to do so. They further assert that she attended the 2013 annual conference and that she apparently has draft version of polices that reflect DCS's ongoing conversations regarding its legal obligations as they relate to removal issues and that she intends to use them in litigation.

In addition to Rule 1.11, former government attorneys are subject to Rule 1.9(c). *See* Tenn. R. Prof'l Conduct 1.11(a)(1). Specifically, Rule 1.9(c) states as follows:

A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter reveal information relating to the representation or use such information to the disadvantage of the former client unless (1) the former client gives informed consent, confirmed in writing, or (2) these Rules would permit or require the lawyer to do so with respect to a client, or (3) the information has become generally known.

Comment 3(c) to the Rule provides, "In a case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in prior representation that are relevant to the matter in question ordinarily will preclude such representation."

The parties disagree as to whether Attorney Trujillo was part of the policy making with respect to Policy 14.12, which is being challenged in the current litigation. [Doc. 35. at 13-14]. The Court has considered the evidence before it and finds that Attorney Trujillo should not be disqualified on this basis. The Court acknowledges that Kovac testified that Attorney Trujillo participated in the discussion that occurred during the annual CLE event and that Attorney Trujillo was "helpful" and an "integral part of the analysis." The Court also observes, however, that Kovac and others wrote the policy without the assistance of Attorney Trujillo.

 Based on this information, the Court cannot find that Attorney Trujillo personally and substantially participated in drafting the policy in dispute. Further, it is unclear to the Court what specific information Attorney Trujillo has gained through her former position as RGC that can be used at DCS's disadvantage per Rule 1.9(c). The Complaint in this case alleges, "DCS Policy 14.12 describes a scenario where the agency can petition the juvenile court for ordered services or removal into state's custody while affording due process of law such that all parties can present their information to the Court. [Doc. at ¶ 75]. The Complaint continues, "DCS Policy does not permit the Application and Order to Investigate, nor does said policy permit the ex parte relief

sought and obtained by Defendant Smithwick." [*Id.* at ¶ 76]. The Court finds that such allegations can be litigated by simply reviewing the policy to determine if Defendants complied, regardless of how the policy came to be. While other statements in the Complaint allege that the DCS policy "as adopted" does not meet constitutional standards, the Court does not have any evidence before it that Attorney Trujillo gained any knowledge through her position that will be used at DCS's disadvantage in violation of Rule 1.9(c). Further, although Defendants assert that Attorney Trujillo trained and supervised DCS attorneys, the only allegations in the Complaint regarding negligent supervision are against Defendants Crawford and Diamond, which were Attorney Trujillo's supervisors. Finally, there is no evidence before the Court that Attorney Trujillo actually supervised anyone when the 2016 petition was filed by DCS, and no party disputed Attorney Trujillo's statement to the Court that Defendant Crawford was the direct supervisor during the time of the 2016 matter against the parents. Because the Court finds no conflict, the Court does not need to address whether an attorney-client relationship exists since DCS was voluntary dismissed.

Finally, Defendants argue that Attorney Trujillo should be disqualified because she is a necessary witness to contested issues. Tennessee Rule of Professional Conduct 3.7 provides as follows:

> (a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issues;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.

"For a lawyer to be a necessary witness, his testimony must be relevant, material, and unobtainable elsewhere." *Rotheberg v. Cincinnati Ins. Co.*, No. 1:06-cv-111, 2008 WL 2401190, *2 (E.D. Tenn. June 11, 2008). In other words, "an attorney is a 'necessary witness' only if 'there are things to which he will be the only one available to testify.' " *Id.* (quoting *Droste v. Julien*, 477 F.3d 1030, 1035 n.7 (8th Cir. 2007)) (other citations omitted). The party requesting disqualification carries the burden of proof. *Id.*

At this point, it is unclear to the Court if Attorney Trujillo is "likely to be a necessary witness." Citing Count Thirteen of the Complaint, Defendants assert that it alleges that Defendant Dimond failed to supervise Defendant Smithwick, which is a least arguably a task Attorney Trujillo was responsible. Count Thirteen, however, discusses Defendant Dimond's alleged failures as the General Counsel for DCS as allegedly the person in charge of all the subordinate attorneys. *See* [Doc. 1 at ¶ 107]. Further, Count Thirteen also states that such alleged failures caused Plaintiffs' harm, which as explained above, Attorney Trujillo was not involved in the 2016 matter. Defendants further argue that Smithwick has raised qualified immunity as a defense in this matter and that part of that qualified immunity analysis turns on whether a reasonable official in Smithwick's position would have done as he did. Defendants state that as Smithwick's supervisor, Attorney Trujillo is certainly a necessary witness as it relates to qualified immunity analysis. The Court, however, is unconvinced that Attorney Trujillo is a necessary witness, especially since Defendant Smithwick was able to raise his qualified immunity defense in his Motion to Dismiss [Doc. 4 at 12-14], without any testimony from Attorney Trujillo. Accordingly, the Court finds Defendants' arguments are not well taken at this time.

The Court, however, admonishes the Plaintiffs that Rule 3.7(a) provides that a "lawyer shall not act as an advocate *at a trial* in which the lawyer is likely to be a necessary witness."

(Emphasis added).  Should it develop that Attorney Trujillo is likely to be a necessary witness at trial, and that none of the exceptions apply, she could be disqualified at that point.  Given that Plaintiffs are aware of the potential conflict that may develop, the Court may not lend credence to any argument that such disqualification would work a substantial hardship on Plaintiffs.

V.      **CONCLUSION**

Accordingly, for the reasons explained above, the Court hereby **DENIES** the Motions to Disqualify [**Docs. 5, 28**].  Plaintiffs shall respond to the pending Motion to Dismiss [Doc. 3] on or before **February 26, 2018**.

**IT IS SO ORDERED**.

ENTER:

_____s/ C. Clifford Shirley, Jr.\_\_\_\_\_
United States Magistrate Judge